In our second case this morning, we have the United States v. Nutter. Mr. Coleman, good to have you with us. Good to see you again, Mr. Coleman. Thank you, Your Honor. Good to see all of you. May it please the Court. I represent David Nutter. He's a 15-year-old, 57-year-old ex-Navy veteran. He lived in Somerville, West Virginia, had been married 30 years and raised his wife's three stepdaughters. He was a laborer for the majority of his life after getting out of the Navy. He spent most of his life in Ohio, and then for 13 years before his conviction in this case, he had moved again to West Virginia. My client's possessed, in violation of 922 G-9, a squirrel rifle, two shotguns, and a revolver. What they didn't count were three muzzleloaders that had been his wife's father's, but these were family guns. This isn't a case where he went out and bought anything illegally or did anything nefarious with the guns. His criminal history went back to 1998 when he pushed one of the 16-year-old stepdaughters in an altercation and led no contest to that in Ohio. That was a misdemeanor conviction. Then four years later, sir? If I could ask you at the outset, what you're bringing here is a Where do we find your as-applied challenge? Well, this was my first proven case. This was the first one our office had, and we went through the structure of that text in the case and didn't differentiate with labels. We argued about the age of his convictions throughout as mitigating against the statute applying to him. Most of my argument, yes, was . . . What I'm looking for is either where you told the district court we're making an as-applied challenge and here's what it is, and where you've told us in your briefing you make an as-applied challenge and here's our argument. I made that in the supplemental memorandum parsing it out. It was made together the way the case was written throughout when Broome was first announced. I know our magistrate and district judges were saying it didn't even apply in a criminal case because that wasn't what was before the court, so other than arguing the facts of the age of his past convictions and what they were, we didn't do anything really beyond that. To me, at least, that's a significant distinction because I have to say I'm not finding a specific as-applied argument in your supplemental briefing, at least. I do not have the page number before me. When opposing counsel argues, I will look for that. I did make the reference, but I also find the two so convoluted, other than notifying you we're making both, I think they both apply. Because in a facial challenge, all the government has to do is show a circumstance where the statute can apply. That's true. I don't dispute that, and Rahimi made that clear. Bruin did not. Bruin, means and scrutiny evolved out of Salerno. Right, but a facial challenge is a facial challenge. I don't know that it's any different under the second amendment. I agree. That's not in dispute, but I would point out two things. Well, one I'll say, but Salerno was very closely tied to means and scrutiny, necessarily, and when we got rid of means and scrutiny, Bruin was very opaque to where Rahimi had to correct it and say, hey, we still are doing Salerno, which was afternoon it was filed, argued, and originally briefed. I mean, in the briefing, we've gone. But before your supplemental brief, I mean, you had a chance to brief this case after Rahimi, right? I'm sorry, isn't your supplemental brief after Rahimi? Yes, ma'am. Okay, so Rahimi made clear whatever thoughts anyone might have had about Salerno after Rahimi, it's clear. Like, we're just doing regular Salerno here. I think that's what Rahimi has left us, yes, ma'am. Okay. Yes, ma'am. But, okay. And you had a chance in your supplemental brief to post-Rahimi say, now we understand these are two different things and we are bringing both a facial and an as-applied challenge. Yes, ma'am, but they're so heavily integrated, we felt there was enough noting the age and type of conviction in the midst of arguing the substance of Bruin and how it applied to the statute. There was no intent, certainly, and no abandonment or forfeiture of the issue. Well, as to a facial challenge, the Sixth Circuit recently decided a case called Gales. Yes, sir. And would you say in that circumstance that the statute was inappropriately applied? Because the convictions there were not old and cold and were multiple and they were all violent. Yes, I will, and I will start with a concept I want you to think about during oral argument with opposing counsel and when you're writing whatever opinion you do. With Hunt and with Canada, other statutes, there's been a lot of talk, and with government briefing going back, God, to Heller, that the Second Amendment only applies to a law-abiding citizen. We had, with Chester going forward through Staten and the other opinions, this, we had a different two-prong test, and then we all started focusing with Chester. I don't think the government's contending that Mr. Nutter's not part of the people for Second Amendment. I think they are now, and I think you're right, but looking at the historical analysis, the consideration, starting consideration should be with conduct. Anything that goes back, I'm mentioning for the first step, and then I'll get off of it. I suggest you look at it as conduct of a law-abiding citizen. In other words, what they are doing, what we've identified in Heller as a conduct that's protected by the Second Amendment, what a law-abiding citizen does with that gun, not who's doing it. The argument has gotten conflated, distracted in a lot of lower court cases in this circuit and in others looking at, well, who, who, who? And in Chester, we even got into it at one point. Staten didn't say it, Hamilton did, that, hey, we're in step one, we're not going to look at what they're doing with the gun, so I wonder if we could move on. But the hub-by distinction matters. Getting to Hunt and answering your question about Gales. Gales was concerning to me for two reasons. A lot of it is based strictly on observations Justice Sotomayor made in her concurrence, but more importantly, this concept, this over-generalized concept of dangerous people and how the historical analog. I mean, really, let's acknowledge right now we're at the step two in Brewer, and that's what this appeal is about, whether it's going to be facial or is applied to Mr. Nutter. This is where it's migrated since the original briefings. He, rightly or wrongly, seems to give a fairly broad brush to the capability of the government to restrict firearm possession by people that are deemed to be a threat to public safety. And they go into some detail on the surety laws, both English and colonial, and the affray laws, French, English, and colonial. There were probably some significant historical errors in the Chief Justice's opinions, but they're the Supreme Court, and they've told us what the law is, and the Congress has made a determination that people who commit these domestic violence acts are a threat to public safety. So why is that inconsistent with Rahimi? Rahimi looked at surety laws aimed at limiting domestic violence, which had nothing to do with guns, where if one got forfeited, it was the gun you had at the time. It didn't totally ban the right to arm and defend yourself or to get food. I think you're right. I think there are historical errors in the Court's opinion, but it says what it says. It does. It also says with the affray laws, which are just committing a crime with a gun. That's what going around and terrorizing the public with a gun is. And we haven't seen affray laws really stay on the books because all these other crimes over the past two centuries have displaced them. But all it says is with respect to a temporary disarmament, it says during the period of this order. And you don't even need a counter order for it to, it just expires. If you don't go on to something else, when the order's in effect and it goes away with a case, there's no more disarmament. It's temporary. I grant you that in a proper as applied challenge, but I'm not sure how that, the temporal element figures into the facial challenge. Oh, it has to with that because all the writing Justice Roberts did was to justify a temporary disarmament. Okay, then what should I do with Hunt? Because Hunt of course said no as applied challenges to felon in possession permanently. This isn't a felony. Well, I know, but Hunt covers a lot of nonviolent felonies. So Hunt says, let me just finish. Hunt says that there is a tradition of doing this on a categorical basis, not an individualized basis and doing it permanently. That's what Hunt says. So you have now both Rahimi and Hunt to get through. And I think Hunt is a real problem for you in trying to rely on the permanent nature of this bar. Respectfully, Your Honor, felonies were distinguished from the beginning of the colony, so much so that six colonies with their charters had expressed provisions to enact less sanguineous criminal laws. I had to look it up. I don't know what it meant, but it meant you didn't kill so many people for the laws they broke. When you go back to Hamilton, which Hunt says is still good law, we're still getting that a felony represents such a departure in judgment that no one later can ever be trusted with having a gun again. That's not a misdemeanor. And if there are no guardrails or distinctions of this, this is what Justice Thomas pointed out in the Rahimi dissent, which just because it's a dissent doesn't mean it's applicable here because Roberts didn't contradict it. We don't have any guardrails if we go the way the government has argued in this or if we take Hunt to its extreme. And I don't know necessarily that that panel intended it to go to that extreme. They were definitely laying something out for felonies and leaving open the door for, I mean, it was kind of like felony equivalence when that term was used with Chester moving up before Bruin. And now we've got, while the emphasis in Hunt was definitely on felons, you're right, there's this other part that's open, but that wasn't pertinent to the decision, was it? That didn't decide it. That's easily dicta, just like the presumptively law. I'm sorry, which part of Hunt is dicta? Beyond being convicted of a felony. The generalization that legislatures, and a lot of that relies on state legislatures that were not even subject to the Second Amendment at the time they passed laws making categorical distinctions. Our law allows categorical distinctions. I'm not disputing that. But which ones and to what degree? How do we measure what is a dangerous person the way Gales talks about it? Well, I think we let the legislature do it, right? The legislature made a judgment that this is a dangerous category of people. Just like in Rahimi, they made a judgment. Which historically goes beyond what was done at the time of the founding. We still have to, post Rahimi, do the same how and why. I think you're probably correct on that, but the Supreme Court decided it anyway. And we have to go by what they said. And they said we have to do the same why and the same how. The why we can see a merger of and consistency with, you can't really debate that. The how is what's violating the historical precedent. We didn't start disarming people permanently until 1934. We didn't start doing this with domestic violence misdemeanors until 1996. A time when Bruin even says is not even historically relevant in determining. I thought you just said the why you agree. There is a historical tradition of disarming people for this purpose because they are deemed dangerous. Then I wasn't clear with what I was saying. There was a historical acknowledgment of the problem through surety laws of having them post a bond. If they felt there was that threat. But there were disarmaments en masse during the colonial period. If you were enslaved, if you were an American Indian. Some colonies if you were a Catholic or some other particular. So obviously we wouldn't do that today, but at the time of the adoption of the Bill of Rights, there was this history of disarming entire categories. Which is what brought the Second Amendment around with the text it has. We had a period of time of 20 to 40 years. That's just flatly foreclosed by Hunt. Hunt says we can look to that tradition of categorical disarmament. We are bound by Hunt. I understand you think Rahimi is wrong, you think Hunt is wrong. But that's not a luxury that we have in deciding this case. But the part of Bruin, Your Honor, that is not missing is that it still requires a well-established and recognized tradition. If we take principles so open-ended that you do what Gales did. Which would say it doesn't have to be related to the same why at all. They disarmed that group, so that's okay. That's also what we did at Hunt. And maybe you think that was dicta. I wasn't really clear on which parts of Hunt you thought we could exercise as dicta. The non-felon I felt based on some of the authorities cited and the fact that it went beyond dealing with the issue before the court, which is a felon. No, it really didn't. The Hunt panel relied centrally on this history of disarming as a categorical just done deal. Everybody in this category is disarmed. Hunt relied on that. It's its reasoning. It did. But this is a different category. We're calling this a misdemeanor. The state laws do it. Congress did. That means something or what's the point? If you're going to do it to misdemeanor domestic violence, then what about the person who violates a parking meter? What about the person who drives too fast and endangers lives on the highway? What's the proper proxy for dangerousness? This is not an adequate proxy for dangerousness looking even at Mr. Nutter. It was 17 years ago. He did under one offense. Boise has said this can be done. How? Recklessly. The plate against the wall. The second conviction. What was the full beer can at the baby? Was that reckless or was that intentional? The half full beer can was at the adult and deflected and hit the child. So aiming at the adult but hit the baby. It hit near the adult and deflected. Yes, people were hit. That's not in dispute. And I'm not minimizing that. It seems like you are. No, but compared to what? Compared to felony convictions, which again at the time of the founding had you executed. They wouldn't have done that necessarily for a far punch or for even hitting right or wrong. But it's called a misdemeanor for a reason. It's under the code federally. And then we get to Castleman where it's an offensive touching. We're going to deprive people of a fundamental constitutional right for their entire life. On one elementally, if we do it categorically, looking at 922 G9, what does it actually boil down to when you get to the case constructions? A misdemeanor crime of domestic violence is a crime that has as an element the use or attempted use essentially of offensive touching that can even be done recklessly. That's what Boise and Castleman put together give us with that statute and that definition. And that under any combination of historical analogs doesn't seem to satisfy the brewing requirement, even under a relevantly similar analysis, that it be a well-established and recognizable, even as a principle. What are we going to define violence as? What are we going to define danger? This is the same problem we had with responsible in Rahimi and the way the court reacted to that. I don't think Hunt addresses that. And we don't have any guardrails or standards to define if dangerous is going to be it. If the courts are going to be adopting a dangerous standard, measured by what? We don't even agree on what physical injury requires, state by state or even federally, depending by crime. And in the misdemeanor context, physical injury is not even what the common man would look at as a physical injury at all. And people are convicted of that. And yet the Congress in 1968, as developed then later all the way up until we finally included domestic violence misdemeanors in 1996, 20th century mechanisms are now defining the historical scope of something that was enacted in 1791. And what I'm seeing, Your Honors, that is concerning me is not the deference to the Second Amendment that the Supreme Court intended, but more an enshrinement of familiar gun regulations that we all know. The fact that something is unfamiliar to us with this, applying the law consistently, is not necessarily a bad thing. And if it turns out to be, Congress then can act and do it further and have it continue to be reviewed pragmatically through the process that was contemplated by the founders setting up our system. And then when Justice Marshall did it, we did it with Marbury v. Madison. We've been really generous with the time. You have been, and I'm over it. You recognize what that red light means? I do. I was trying to get your questions. If there are no more, I'll sit down. Thank you. You say some time. Mr. Glaser? May it please the Court, William Glaser for the United States. I'd like to start where Mr. Coleman left off, addressing the sort of scope of Section 922G9 after Castleman v. Voisin. There are certainly applicants. Let me ask you the same question I ask opposing counsel. Is this a facial challenge that's been brought, or do they have an as-applied challenge? Your Honor, we understand it to be a facial challenge. And he does say on page 2 of his supplemental brief that it's both facial and as-applied. I think the problem is that, as you mentioned, he hasn't actually developed any sort of as-applied argument that would apply to him specifically. And I think this is where the sort of Castleman v. Voisin riff is just really beside the point, because what we have here is an application to Mr. Nutter where he was not convicted under a Castleman v. Voisin doctrine. He actually knowingly used force, and the force was the kind of violent force that would qualify even outside of Castleman. He knowingly used violent force not once but twice when convicted of these domestic violence misdemeanors. And all this court needs to decide to resolve his facial challenge is that it has some constitutional application. Now, you could sort of hypothesize a constitutional application, or you can just do as the Supreme Court did in Rahimi and say it's constitutional on its face because it's constitutional as applied to this particular defendant, Mr. Nutter. I think that's an easy way to go, because— Did we simply say it's constitutional as applied to Mr. Gales? Sure. I mean, that's a circumstance. Your Honor, yes, you could certainly do that. Again, you could hypothesize, and Gales is, I think, a good example of someone to whom it can be constitutionally applied. But we also think it's constitutional as applied to Mr. Nutter, and that is another way that you could get there. Again, as I mentioned, the parts of the Ohio Code under which he was convicted require knowingly causing injury to the victim. And so that's not reckless, and the way that injury is defined there lines up consistently with the type of violent force that is required outside of the—which is above and beyond the common law battery context. If I could then turn to this court's decision in Hunt and how that might interact with Rahimi, we think that essentially, although Hunt dealt with felonies, essentially the combination of Rahimi and Hunt foreclosed Mr. Nutter's argument here. Rahimi established that those who have committed domestic violence can be disarmed, at least temporarily, consistently with the Second Amendment. What Hunt does, above and beyond that, is say that there's—well, it does two things. It says that Congress can make the determinations as to who's dangerous. It doesn't have to be a judicial officer, as it is in the context of 922G8, the provision at issue in Rahimi. And secondly, it says that Congress can make these determinations sort of on a categorical basis and not—this court doesn't need to consider, as applied to every particular person, whether or not that person is dangerous. So the court said in Hunt, past conduct can warrant keeping firearms away from persons who might be expected to misuse them. And we think that the statistical evidence, common sense, even the court's decision in Rahimi, indicate that Congress could conclude that persons convicted of misdemeanor crimes of domestic violence are dangerous and that they are likely to misuse firearms. I would point out that Section 922G9, the definition of a misdemeanor crime of domestic violence, is not quite as broad as in the context of the Armed Career Criminal Act. So it doesn't extend to simply the threatened use of force. It requires either the use or attempted use of physical force or the threatened use of a deadly weapon. So it's a fairly narrow provision that applies only to misdemeanors where there has been force that is used, attempted to be used, or where there's a threatened use of a deadly weapon. So this is not going to reach to all misdemeanors. It's only a narrow category of violent misdemeanors. And Congress could conclude, based on the statistical evidence, that people who have committed these crimes do pose a danger, not just to their family members, but to others if they're allowed to be armed. Although the facts in this case are somewhat in dispute, I think Mr. Nutter is a good example of someone, a good example of why Congress could make that judgment. So there were three corroborated accounts by minors in this case that Mr. Nutter pulled out firearms, swung them around while intoxicated, bragged about being a felon. Now, the district court didn't resolve that factual dispute, and Mr. Nutter denies that he engaged in that conduct. But one way or the other, two days later, when the sheriff's deputies executed a warrant at his house, they found these firearms. So we think that Mr. Nutter is squarely within the group of people that Congress could determine are dangerous if allowed to be armed. If I could just make one final point, I think that the decision in Gales does a good job sort of describing the interaction between Rahimi and, in that case, binding circuit precedent on G1. I think this court's decision in Hunt does something similar. And I think there's a couple of sort of inferences that this court can use to extend, and we recognize it as an extension, of Hunt to the facts here. If you look to the historical analogs that Hunt relied upon, Hunt relied, for example, on the fact that you could forfeit firearms for non-capital crimes. So Hunt referred to colonial-era offenders who committed non-violent hunting offenses and were still ordered to forfeit their firearms. If someone can be disarmed for a non-violent felony based on the rationale that it's a serious offense and that it's dangerous, then I think for the same reason someone who has committed a violent misdemeanor can be disarmed based on a dangerousness rationale. So for those reasons, we think that the historical analogs, as discussed in Hunt and in Rahimi, are more than sufficient to justify Section 922G9 under the Second Amendment. If the court has no further questions, we would ask the court to affirm. Thank you very much, sir. Mr. Coleman? I'd like to thank my appellate counsel for digging up the joint appendix. The reference is to an as-applied challenge, Your Honors. Joint appendix 11 in our motion to dispense, joint appendix page 15, joint appendix on page 24 in the government's response, joint appendix page 35, and joint appendix 104. But where's your argument to that effect in the supplemental brief? Other than referencing that we're making both, I don't elaborate on it because I consider them both conflated. But that's where we had brought them up in the record before, that and just the undisputed circumstances with him. As far as inferences in Hunt, hunting violations in England were the forfeiture of the weapon you were hunting with. You were not denied permanent firearm rights. You lost the value of the gun. Again, I understand that you think Hunt was wrong, but Hunt thought that was a relevantly similar historical tradition to disarming felons not allowed to have any weapon. Yes, Your Honor. It would be most helpful to me if we kind of stuck to arguments that aren't foreclosed by our circuit precedent. Well, I'm agreeing with your point. I don't know that it necessarily forecloses it with misdemeanors. I would equate a misdemeanor more with a hunting violation. I'm not trying to misread Hunt. I know it was relied on that that was good enough to disarm felons, but that law as it was construed in the opinion was never a permanent disarmament. The sheriff and the king would seize the weapon. They could go buy another weapon. When Catholics were disarmed, they were not disarmed from protecting their home. They were disarmed from having a weapon, carrying it publicly, and it was the same. Native Americans were banned from buying guns, not possessing guns, and Native Americans and slaves were never citizens or were not until after the American Civil War when Congress Indians were the last people who were designated that way. So at the time of the founding, they were not part of the people textually protected by the Second Amendment. So that in part justifies why they thought it was okay to disarm them, even temporarily, and it was temporary. Catholics and non-loyalists could renounce certain things, and the government would give their guns back. They did that, but why, to stop an insurrection with a new country during the middle of the Revolutionary War and the period after it, not because of some generalized public dangerousness, again, which is undefined and has no guardrails. Looking at Ohio with gales, injury in Ohio is defined as anything, even offending or hurting your feelings. It's that broad. It doesn't take a physical injury the way the state defines it. But we're looking at 922G9 and how the federal government defines that, and that does require at least an offensive touching. People, can we categorically disarm people suspected or concerned about misuse? The courts are the only guardrails I know to put on that. And looking at history, who we say hunt is very broad, and anything I would suggest that doesn't directly apply to felons, in other words, to lesser things, look how open-ended that is. Again, if we're going to use that in hunt to extend to the misdemeanant, in this type case, where does it stop? That's my concern. That, again, goes to we're enshrining existing regulations fine. We are not showing the deference the Supreme Court intended to the Second Amendment. Thank you. I'm sorry, you were drinking. You're absolutely right, Judge Harris. I'm not pretending hunt doesn't exist. I didn't say anything. It's a big rock, facially or as applied. Okay. But I don't think it stops the as applied challenge, certainly as to Mr. Hunt. And that, too, I would ask. If you're not prepared to acknowledge the facial challenge and sustain that, at least with respect to Mr. Nutter, those facts that my colleague related to you were in a PSR and were disputed, and Judge Berger did not rely on them in the sentence she imposed and in rulings she made in the case. They were allegations in the discovery. We were prepared to litigate them. The government did not bring witnesses. It was not resolved factually. What was not disputed was since 2002, the only other conviction he'd had was in 2007 for driving without a license. Nonviolent, nothing. And then from 2002 until 2019, he hadn't done a boot. I'm out of time. I appreciate your indulgence. Thank you, Mr. Coleman. We appreciate it. We'll come down and greet counsel, and then we'll take a short break. We appreciate your work. This honorable court will take a brief recess.
judges: Robert B. King, G. Steven Agee, Pamela A. Harris